George Timer, J.
Defendant, having been indicted for the crime of perjury in the first degree, has applied for an order dismissing the indictment, or, in the alternative, for permission to inspect the Grand Jury minutes upon which the indictment against him was found.
The indictment, returned on October 5, 1956, contains one count and charges that “ Defendant, on or about the 16th day of July, 1956, at Riverhead, Town of Riverhead, Suffolk County, New York, committed the crime of perjury in the first degree, contrary to Penal Law, Section 1620-a.” Annexed to the indictment is a statement made by the District Attorney indicating that defendant was indicted on the testimony of two witnesses who appeared before the Grand Jury, namely, Frank Casino and Everett C. Updike, an Inspector of the New York State Police.
Defendant, Updike and Casino had all testified before the Grand Jury in connection with an investigation being conducted by that body with respect to gambling in Suffolk County. Defendant, an Inspector in the New York City Police Department, appeared before the Grand Jury on July 16,1956. During the course of his questioning, and after admitting that he knew both Casino and Updike, defendant was asked, “Have you ever been in his (Updike’s) company and Frank Casino’s* that *567 you can recall? ” His answer was, “ No Sir.” Defendant was then excused and never recalled.
Casino was originally called before the Grand Jury on August 14, 1956, but refused to answer questions so that contempt proceedings were instituted against him. In an endeavor to purge himself of the contempt voted by the Grand Jury, Casino reappeared before that body on August 30,1956, for the purpose of giving testimony. During the course of his examination, he stated that he had known Updike and defendant for about 10 years and that he had met the defendant at social events on about a half dozen occasions over that period. When asked whether he had ever been in defendant’s company with Inspector Updike, he replied that he had and he fixed the time and place as some time during July of 1955 at a restaurant, the name of which he did not recall. He further testified that there had been no prearranged meeting of the three but that he had chanced upon defendant and Updike in the restaurant and had sat down and reminisced with them about old times for half an hour or so and then left the restaurant, leaving defendant and Updike together.
Inspector Updike testified on October 2, 1956. So far as here relevant, his testimony was to the effect that he had telephoned defendant in the early part of July, 1955 and arranged a luncheon appointment with him for the following Tuesday. On the day in question, he met defendant at Police Headquarters in New York City and they drove to Luchow’s Restaurant where they had lunch. While there, Casino appeared, sat down at the table and got to talking with them. At some point during a conversation between himself and Casino, the defendant left the table and did not return. Updike was unable to tell exactly when defendant had left the table but was certain that he had been there during part of the conversation which Updike had with Casino.
In essence, the charge against defendant is that he willfully and knowingly testified falsely when he denied any recollection of being in the company of Updike and Casino at the same time. The evidence upon which the charge is based consists of the conflicting testimony of Updike and Casino. While both agreed that they were with defendant in a restaurant some time in July, 1955, their testimony differs substantially as to the circumstances of the meeting and what had transpired; and also as to their previous personal relationships.
Quite apart from the contradictions and inconsistencies appearing in the testimony of these two individuals, there was a failure on the part of the former District Attorney to establish *568 the falsity of the defendant as to the fact in issue. The defendant’s “ Ño ” to the all-important question as to whether he had been in the ‘ ‘ company ’ ’ of Casino and Updike, without any further elucidation as to the meaning that the defendant gave to the word “ company ”, was insufficient upon which to base a charge that the defendant’s statement was intentionally and deliberately false and not given through inadvertence, error or mistake. This brings to mind Tennyson’s words
“ That a lie which is half a truth is ever the blackest.
That a lie which is all a lie
may be met and fought outright,
But a lie which is part truth
is a harder matter to fight.”
(“ The Grandmother ”, stanza 8.)
Perjury is very difficult of proof. Prosecuting authorities, courts and our Legislature have consistently tried to make indictment and conviction more certain. The basic reason for this fact is that the tribunal of memory is illusive and unreliable. Omar Khayyam said: “A hair perhaps divides the false and the true.” However, the courts have never deviated from the fundamental, special and extraordinary rule adopted solely and exclusively for perjury cases. The highest court of our land, in the case of Weiler v. United States (323 U. S. 606, 608-609) treated the subject as follows:
“ First. The government asks that we reexamine and abandon the rule which bars a conviction of perjury on the uncorroborated testimony of a single witness. The argument is that while this quantitative rule as particularly applied to perjury cases may have been suited to the needs of the 18th Century, it has long since outlived its usefulness, that it is an incongruity in our modern system of justice, and that it raises an unjustifiable barrier to convictions for perjury.
“ Our system of justice rests on the general assumption that the truth is not to be determined merely by the number of witnesses on each side of controversy. In gauging the truth of conflicting evidence, a jury has no simple formulation of weights and measures upon which to rely. The touchstone is always credibility; the ultimate measure of testimonial worth is quality and not quantity. Triers of fact in our fact-finding tribunals are, with rare exceptions, free in the exercise of their honest judgment to prefer the testimony of a single witness to that of many.
‘ ‘ The special rule which bars convictions for perjury solely upon the evidence of a single witness is deeply rooted in past *569 centuries. That it renders successful perjury prosecution more difficult than it otherwise would be is obvious, and most criticism of the rule has stemmed from this result. It is argued that since effective administration of justice is largely dependent upon truthful testimony, society is ill-served by an ‘ anachronistic ’ rule which tends to burden and discourage prosecutions for perjury. Proponents of the rule, on the other hand, contend that society is well-served by such consequence. Lawsuits frequently engender in defeated litigants sharp resentments and hostilities against adverse witnesses, and it is argued, not without persuasiveness, that rules of law must be so fashioned as to protect honest witnesses from hasty and spiteful retaliation in the form of unfounded perjury prosecutions.
“ The crucial role of witnesses compelled to testify in trials at law has impelled the law to grant them special considerations. In order that witnesses may be free to testify willingly, the law has traditionally afforded them the protection of certain privileges, such as, for example, immunity from suits for libel springing from their testimony. Since equally honest witnesses may well have differing recollections of the same event, we cannot reject as wholly unreasonable the notion that a conviction for perjury ought not to rest entirely upon ‘ an oath against an oath.’ The rule may originally have stemmed from quite different reasoning, but implicit in its evolution and continued vitality has been the fear that innocent witnesses might be unduly harassed or convicted in perjury prosecutions if a less stringent rule were adopted.
‘ ‘ "Whether it logically fits into our testimonial pattern or not, the government has not advanced sufficiently cogent reasons to cause us to reject the rule.”
Motions to dismiss an indictment based on insufficiency of evidence before the Grand Jury are governed by the well-established rule herein enunciated (People v. Nitzberg, 289 N. Y. 523, 528-529):
‘1 ‘ An indictment is a record of the court which imports absolute verity until properly impeached. (People v. Hulbut, 4 Denio, 133, 136.) The presumption is that an indictment is based upon legal and sufficient evidence until there is satisfactory proof to the contrary.’ (Italics are new.) (People v. Glen [173 N. Y. 395], supra, p. 403.) In that case the court refused to set aside the indictment saying: ‘ In the case at bar there is no proof of that kind.’ In the case we are now reviewing there is unchallenged ‘ proof to the contrary.’ No ‘ presumption ’ can overcome such proof. In an analogous situation, Mr. Justice Stoby, then sitting as a Circuit Judge, has said: ‘ Lee’s affidavit *570 is direct and positive, as to a fact, of which he could not be ignorant. The counter affidavits are merely of impressions. The court must be g-overned by the rules of evidence, and the facts must therefore be taken to be as stated by Lee. Of the law arising upon these facts there can be no doubt. The Grand Jury is the great inquest between the government and the citizen. It is of the highest importance, that this institution be preserved in its purity, and that no citizen be tried, until he has been regularly accused by the proper tribunal. Every indictment is subject to the control of the court, and this indictment, having been found irregularly, and upon the mere statement of a witness without oath, which was not evidence, a cassetur must be entered.’ (United States v. Coolidge, 2 Gall. 364; s.c. 25 Fed. Cas. 622.)
“ No person may be held or tried in this State upon a charge of felony unless that charge is made by the grand jury in an indictment based upon legal and sufficient evidence. Upon the uncontradicted proof-that the evidence upon which the indictment in this case is based was insufficient as matter of law, the trial court would, it seems plain, have been bound to grant the motion if, before the first trial, the defendant had challenged the indictment by motion to dismiss. The question remains whether the court was bound to grant the motion to dismiss made after the defendant had been convicted upon a trial where evidence legally ‘ sufficient to satisfy the statutory requirement ’ had been produced, though for errors in the charge the judgment of conviction had been reversed and a new trial ordered. The indictment described by Story and other judges as the ‘ great inquest between the government and the citizen ’ is intended to give assurance to the citizen that he will not be held for trial until he has been accused before the appropriate tribunal upon evidence which is competent and legally sufficient ’ ’.
In People v. Nicosia (164 Misc. 152) the court at page 157, said: “ To warrant an indictment the grand jury should have legal evidence before them (Code Crim. Pro. § 256) which, when taken together, would be sufficient, if uncontradicted, for a petit jury to convict the accused. (Code Crim. Proc. § 258.) This means evidence which overcomes the presumption of innocence, still a constitutional safeguard of the accused even in the grand jury room (People v. Lindenborn, 23 Misc. 426); evidence which can justify a verdict of guilt beyond a reasonable douibt. (People v. Acritelli, 57 Misc. 574.) Sections 256 and 258 of the Code of Criminal Procedure are protective measures intended to safeguard the defendant’s right to the presumption of inno *571 cence, and, therefore, an indictment based extensively on conflicting and hearsay evidence, leading and suggestive questions and prejudicial testimony affords justification for its dismissal. (People v. Glen, 173 N. Y. 395; People v. Willis, 23 Misc. 568; People v. Burleson, 119 id. 107.) ”
Again, in People v. Frost (204 Misc. 44) the court, at pages 47 and 48, said:
‘ ‘ An indictment must be based upon evidence which in the judgment of the Grand Jury, 1 would, if unexplained or uncontradicted, warrant a conviction by the trial jury. ’ (Code Crim. Pro., § 258.) And further, section 256 of the Code of Criminal Procedure requires and demands that ‘ The grand jury can receive none but legal evidence.’ The testimony of the sole prosecuting witness Hayner, is pregnant with contradictions and at this time in the proceedings upon this indictment, must be carefully scrutinized. As Chief Justice Lehman, in People v. Nitzberg (289 N. Y. 523, 526) held: ‘ “ It is manifest therefore, that if the only testimony before the grand jury is the testimony of accomplices, it cannot be said to be sufficient, if unexplained or uncontradicted, to warrant a conviction by the trial jury ” and when it appears that an indictment is founded upon evidence which as a matter of law is insufficient to warrant a conviction, the courts have power to set it aside. (People v. Sweeney, 213 N. Y. 37-42.) ’ And continuing, the court held that 1 “ This power is based upon the inherent right and duty of the courts to protect a citizen in his constitutional prerogatives and to prevent oppression and persecution. It is a power which the Legislature can neither curtail nor abolish, and, to the extent that legislative enactments are designed to effect either of these ends, they are unconstitutional.” (People v. Glen, 173 N. Y. 395, 400.) ’ The law is well settled that there can be no conviction for the crime of perjury where the only evidence of the false swearing is that of the accusing witness, or if he had not testified, would thereby have admitted his own guilt. (People v. Henry, 196 App. Div. 177; People v. Sturgis, 110 App. Div. 1.) And in People v. Doody (72 App. Div. 372) quoted in People v. Henry (supra), the court said, ‘ “ Where oral evidence is relied upon to convict a person of perjury, it is necessary to produce at least two witnesses, or one witness, supported by corroborating and independent circumstances.” ’ ”
To warrant the finding of an indictment, the Grand Jury must have legal evidence before them sufficient to overcome the presumption of innocence which surrounds an accused even in the Grand Jury room (People v. Nicosia, supra; People v. Frost, supra). The proof must be of such persuasiveness as would *572 justify a finding of guilt beyond a reasonable doubt (Code Crim. Pro., §§ 251, 389).
Applying these standards to the case at hand, it clearly appears that the evidence before the Grand Jury was insufficient to support the finding of a perjury indictment against defendant. To be sure, the indictment was found upon the testimony of two witnesses, but the number of witnesses in and of itself does not satisfy the requirements for a sustainable perjury indictment. It is the nature and quality of their testimony which controls. As we have seen, the rule requiring at least two witnesses, or one witness and independent corroborating circumstances, to prove a charge of perjury, was evolved for the protection of an accused and to guard against the conviction of a person innocent of such a charge (Weiler v. United States, supra). The statutory purpose of the rule would be defeated if an indictment or a conviction were to be sustained simply because it was predicated upon the testimony of two witnesses, without regard to the quality of the evidence given by them.
Accepting the testimony of Updike and Casino in its entirety, it merely establishes that defendant was with them on the day in question. It does not support or even tend to support the charge that defendant’s denial of any recollection of the meeting was deliberately false. To warrant the finding of such a charge the evidence must admit of a reasonable inference that the defendant was conscious of the falsity of his testimony (People v. Doody, 172 N. Y. 165). The quality of Casino’s testimony will be referred to later. An examination of the Grand Jury minutes fails to disclose any competent legal proof from which such an inference may be drawn.
It is worthy of notes that the question put to defendant on July 16, 1956 appeared at that time to be innocuous. He was given no indication of its importance nor was any attempt made to prod his recollection. If after the testimony of Updike and Casino, given on August 30 and October 2, 1956, respectively, the Grand Jury considered defendant’s testimony on this point suspect, it was their duty and within their power to recall the defendant for further questioning as to the alleged meeting (Code Crim. Pro., § 250, subd. 1). Had they done so, it is entirely possible for defendant’s recollection to have been refreshed to the point that he might have admitted the meeting. In such case no indictment could have legally been found against Rim (People v. Gillette, 126 App. Div. 665, 673).
In passing, it is of utmost importance to note that the transformation of Phillips from the role of witness to that of defend *573 ant is wholly unexplained by the Grand Jury minutes. Where such a transformation occurs, the reasons motivating the Grand Jury should be clearly indicated and not left to speculation or conjecture because they unquestionably involve the rights of the witness and a corresponding duty owed by a Grand Jury and a prosecuting attorney.
A comparison of the glittering generality which formed the basis of the indictment in the case at bar with the questions propounded in the case of People v. Ezaugi (2 N Y 2d 439, 442) clearly demonstrates the deficiency in the evidence upon which the Grand Jury predicated the indictment under attack.
This court is of the view that before an indictment can be found in a perjury case the evidence must affirmatively show that the defendant fully appreciated the situation and his position in it; that every effort was made by the District Attorney (a quasi-judicial officer) to rule out all questions of misunderstanding, mistake, misapprehension and, further, that the answers were intentionally false and misleading. While the court may assume that all this was done by the District Attorney outside the Grand Jury room (a point not raised), due regard for the rights of the defendant and the high esteem which all must have for our Grand Jury system require that the Grand Jury minutes actually show these facts. The minutes are barren of any such proof or of any other competent proof sufficient to sustain the indictment.
The events subsequent to the filing of the indictment herein are of prime significance because they have a direct bearing upon the indictment. They may not be overlooked or disregarded without making a mockery of justice. Consequently, these post-indictment events must be considered by the court in the exercise of its inherent power to prevent injustices. The Court of Appeals has shown to what extent the courts have gone in order to protect the rights of a defendant (People v. Nitzberg, supra).
The salient facts occurring after the filing of the indictment are as follows:
1. The Grand Jury failed to take any further action on this phase of the investigation other than to indict the witness Casino. Among other things, Casino was charged with giving testimony before the Grand Jury which was “ improper, inconsistent, evasive, contradicted testimony, so obviously untruthful and so palpably absurd and deceptive ’ ’.
2. When Casino was arraigned before this court for the purpose of fixing bail, the Attorney-General advised the court that *574 Casino had a criminal record dating back to 1925, and that he had no legitimate means of livelihood or business.
3. The Special Assistant Attorney-General elected to try Casino before the defendant Phillips. On January 13, 1958, the Attorney-General notified the court that Casino was unable to appear and was in the hospital due to a very serious heart attack. Bail was forfeited and the forfeiture still stands. In fact, recently, in open court, the Attorney-General notified the court that the defendant 1 ‘ is still serious and obviously in the immediate future cannot be brought to trial.”
4. The witness Updike went to South Vietnam, Avhere he has actually resided for the past year and where it is expected he will remain for a few years longer.
While under normal circumstances Casino’s previous criminal record would merely require a close scrutiny of his testimony, it is of far greater importance in the unusual facts and circumstances of this case. His criminal background, coupled Avith his indictment for testimony given before the same Grand Jury which indicted the defendant, degrades the quality of his testimony and renders him ineffectual as one of the two witnesses necessary for perjury conviction, even though he may be acquitted of the charge made against him. This is so because no court could, in good conscience, permit a conviction to stand Avhich was based on such extremely questionable proof emanating from a most unique set of circumstances. On the other hand, if Casino should recover sufficiently to stand trial, and is convicted, he would be automatically eliminated as a witness, good or bad, since no prosecutor could honestly vouch for Casino’s veracity in a trial against Phillips.
In view of the fact that the Attorney-General has moved with all due expedition and that whatever delay which occurred cannot be attributable to him, a motion to dismiss for lack of prosecution would fail. However, this court has a positive duty to see that the defendant is protected in his ancient right “ to a speedy * * * trial ’ ’, a right firmly embedded in our Federal and State Constitutions and in the Code of Criminal Procedure of this State.
The prosecutor’s ability to bring Phillips to trial depends entirely upon the availability of both Casino and Updike, neither of whom are presently at his disposal. Casino is seriously ill and there is no indication when, if ever, he may be permitted to testify. Updike is beyond the jurisdiction of the court, and there can be no assurance that he would be AAdlling to return at the precise time that Casino would be able to testify. Their *575 appearance at the same time must be assured. Even if Updike could be induced to return, it could only be accomplished by the expenditure of a large sum of money which, in the light of all the circumstances, this court would regard as an unwarranted waste of public funds.
It has been consistently held that it is the duty of the prosecutor to see that the defendant is brought to trial. “ ‘ When the state sees fit to charge a defendant by indictment with the commission of a crime, it is equally the duty of the prosecutor to see that defendant is arraigned and enters a plea and speedily brought to trial, as it is to charge him with the offense in the first place (People v. Prosser, 309 N. Y. 353, 358.) A speedy trial is not wholly dependent upon the diligence and good faith of the prosecutor. Where, as in this case, after a lapse of 19 months following the indictment the court is firmly of the opinion that the totality of the evidence establishes that the requirement for a speedy trial cannot be fulfilled, it becomes the solemn duty of the court to dismiss such indictment. Although it is a well-established maxim of law that the presumption of innocence is with all defendants up until the verdict is rendered, nevertheless it is universally recognized that an outstanding indictment constitutes a cloud on a person’s reputation and very existence. This defendant, up to the time of the incident herein involved, enjoyed a good reputation as a courageous and competent law enforcement officer. The indictment undoubtedly hastended his retirement. It would be cruel and inhuman and in clear violation of a defendant’s rights to permit the indictment to stand under all the circumstances herein enumerated. Adherence to the principle of law here announced transcends the issue of any particular defendant’s guilt or the disposition of any particular case (People v. Prosser, supra, p. 361).
In the circumstances, concluding as the court does, that the indictment is founded on insufficient evidence, and on the further ground that the court on its own motion may dismiss in the furtherance of justice (Code Crim. Pro., § 671), the indictment is dismissed, the defendant is discharged, and his bail exonerated. The motion to inspect is denied. The clerk will enter such direction upon his minutes and file this memorandum in compliance with the Code of Criminal Procedure.
Submit order.